**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| STACY KEMMLER, | Case No.: 1:23-CV-239 |
| Plaintiff, | **Jury Trial Demanded** |
| v. | |
| SAINT MARY'S HOME OF ERIE, INC., | |
| Defendant. | |

## COMPLAINT

Plaintiff Stacy Kemmler ("Plaintiff") brings this complaint against Saint Mary's Home of Erie, Inc. ("Saint Mary's" or "Defendant") and alleges as follows:

## NATURE OF THE ACTION

1. This is an action for religious discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2 *et seq.* Moreover, this Honorable Court has jurisdiction over Plaintiff's state law claims to the extent that she pleads them pursuant to 28 U.S.C. §1367.

## THE PARTIES

2. Plaintiff, Ms. Kemmler, is a citizen of the Commonwealth of Pennsylvania.

3. Saint Mary's is a non-profit Continuing Care Retirement Community with a corporate office at 1781 West 26th Street, Erie, PA 16508-1256 and main campus at 4855 West Ridge Road, Erie, PA 16506-1213.

**JURISDICTION AND VENUE**

4.  This Court has original jurisdiction of this action pursuant to 28 U.S.C. §1331 as one arising under laws of the United States. *See* 28 U.S.C. §1331.

5.  Venue is proper in this Court under 42 U.S.C. § 2000e-5(f)(3) because the "unlawful employment practice[s]" giving rise to this lawsuit took place within this district.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

6.  All conditions precedent to filing claims under Title VII have been performed or have occurred. Namely, Ms. Kemmler filed a timely charge of discrimination with the U.S. Equal Employment Opportunity Commissions ("EEOC") on December 3, 2022, which was received and docketed. Later she dual filed her claims as an Amended Charge with both the EEOC and the Pennsylvania Human Relations Commission ("PHRC") on December 27, 2022, docketed as 533-2023-00464. The Plaintiff has fully exhausted her administrative remedies as to her federal claims and may seek to amend her claims to include her state discrimination claims once they have fully been exhausted (see **Exhibit A**).

**FACTUAL BACKGROUND**

7.  Defendant is a continuing care retirement community located in Erie, Pennsylvania. Plaintiff worked for the Defendant as a Controller from July 3, 2017, to December 1, 2018, when she became the Chief Financial Officer until

February 28, 2022, when she was terminated.

8. On or about November 5, 2021, Saint Mary's sent a memo (**Exhibit B**) to all employees that the Center for Medicaid and Medicare Services require a vaccine mandate with a January 4, 2022, deadline to be fully vaccinated. If deadline not met, you will be considered to have "voluntarily terminated." However, in the memo, Defendant stated "[u]nvaccinated staff may request a medical accommodation or a religious exemption through human resources." Further, Defendant would evaluate the requests on a case-by-case basis.

9. On or about November 29, 2021, Plaintiff submitted a Religious Exemption Request Form (**Exhibit C**) to Saint Mary's for the Covid vaccine mandate which stated Ms. Kemmler's religious and personally held beliefs for not taking the vaccine.

10. On or about January 14, 2022, Human Resources Director Paula Garczynski ("Garczynski") and the Vice President of Operations Bob Orton ("Orton") met with Plaintiff, and Garczynski handed her a letter (**Exhibit D**) and indicated that they "are unable to grant the religious exemption." Plaintiff asked, "so this means that there are no exemptions being granted at all throughout the entire company." Garczynski answered, "unfortunately no."

11. In the letter, Garczynski, reiterated a conversation wherein she and Orton had evaluated the Plaintiff's request, based on her religious beliefs, and

scrutinized the belief of the Plaintiff adding their own commentary that she had not "…consistently and uniformly objected…" to the use of such products as Ibuprofen and flu shots which they claim also contained aborted fetal stem cell lines. Upon this information, they denied Plaintiff's request. This decision they claimed was based upon transmission of the virus to employees who treat residents as well as due to the Plaintiff's allegation that the vaccine caused one's DNA to be changed. Plaintiff made this claim based on her belief that God created her DNA and she was not to do anything to possibly change or destroy what God had created.

12. Furthermore, Plaintiff responded to the January 14, 2022, Denial letter stating that she was not aware prior to the Covid-19 vaccine that the flu shot, or Ibuprofen contained aborted fetal stem cell lines and that, if she had been aware of that, she would never have taken or used those items.

13. Saint Mary's Home stated that they could not grant accommodation. However, they had successfully accommodated employees since the beginning of the pandemic and protected staff and residents by using Zoom for meetings, social distancing, PPE (Personal Protective Equipment), testing and infection control, frequent hand washing, etc., of which all staff, including Plaintiff had fully adhered to. Also, the corporate office, which was Plaintiff's primary work location, was several miles away from where the direct care

staff provided care to residents.

14. The primary concern of Saint Mary's, which is stated in the last sentence of Item 3 in the letter, was to protect the financial funding they receive from Medicare and Medicaid, not to consider Plaintiff's request for exemption based on her sincerely held religious, which are protected under Title VII of the Civil Rights Act of 1964. Further, the third sentence of the last paragraph of the letter states that "[i]f you continue to refuse to be vaccinated, you risk termination".  In fact, Saint Mary's did terminate Plaintiff, but labeled it as "voluntarily resigning."

15. On January 18, 2022, there was a finance meeting, and the CEO, Allen Bonace, made an announcement that Plaintiff would not be taking the vaccine and that she will be terminated effective February 28, 2022, unless she takes it. This created a great deal of stress and anxiety since Plaintiff had already been told she would not be accommodated, and she began to be harassed by others who capitulated.

16. On or about January 27, 2022, Plaintiff worked her last day at Saint Mary's.

17. On or about January 28, 2022, Plaintiff was placed on a leave of absence.

18. On February 02, 2022, Plaintiff received a letter from Garczynski, **(Exhibit E)** reminding her that February 14, 2022, was the last day to receive a vaccine to be considered fully vaccinated by February 28, 2022.  "If you are not fully

vaccinated by the February 28, 2022, date, you will be out of compliance and will be considered as resigning from Saint Mary's Home of Erie." This although Saint Mary's did not require residents to receive a Covid-19 vaccine.

19. Furthermore, during this time, employees of Saint Mary's were getting infected and missing work, even though they had been vaccinated.

20. On February 28, 2022, Plaintiff received a letter from Garczynski stating "you are not considered fully vaccinated to comply with the CMS healthcare mandate and will be considered as resigning from Saint Mary's Home of Erie effective February 28, 2022." (See **Exhibit F**). This effectively terminated the Plaintiff's employment on this date.

21. Plaintiff avers she has been discriminated against based on her religious beliefs when Defendant refused to engage in good faith interaction regarding her requests and to accommodate her beliefs. Subsequently, Defendant retaliated against the Plaintiff by terminating her for seeking remedies under the law due to her protected status after she had opposed the termination based on her religious beliefs.

22. In denying Plaintiff's request, Defendant decided instead that it could rely on the argument that it would be a "significant undue hardship" to allow unvaccinated employees like Plaintiff to continue working for the company—an unsupportable claim. Setting aside the fact that the overwhelming majority

of U.S. based companies managed to navigate the COVID-19 pandemic without instituting a vaccination mandate, there were a multitude of no-cost accommodation options available in Plaintiff's specific case. Thus, the Plaintiff could have been accommodated but was forced out of her job.

23. Although Defendant used testing for COVID-19 as an option while no vaccine existed, it never discussed weekly testing nor its costs with the Plaintiff when Plaintiff sought accommodation and it raised the issue of undue hardship. There were and are a multitude of convenient, cost-effective COVID tests available on the market.

24. Defendants' management repeatedly asserted throughout the relevant timeframes, through word and action, that the available COVID-19 vaccines were effective at preventing transmission of the virus and that the Policy was necessary to ensure workplace safety. While absolute vaccine necessity was always a dubious proposition, the inefficacy of the vaccines at preventing the contraction and transmission of COVID-19 became increasingly clear in October and November of 2021 as the Omicron variant became dominant. Nonetheless, Defendant terminated Plaintiff on February 28, 2022.

25. Upon information and belief, Defendants' own records will likely demonstrate that Defendant was aware of the fact that the vaccines mandated by the Defendant were not effective at stopping transmission of the virus

during the relevant timeframes.

26. Any reasonable person viewing these facts would deduce Defendant simply intended to undermine Plaintiff's religious beliefs and that Defendant's grounds for denying Plaintiff's request for accommodation was pretextual.

27. The EEOC Guidelines have made clear that "when there is more than one means of accommodation which would not cause undue hardship"—which existed in Plaintiff's case— "the employer . . . must offer the alternative which least disadvantages the individual with respect to his or her employment opportunities." *See EEOC Commission Guidelines*, 29 C.F.R. § 1605.2(c)(2)(ii).

## REASONABLE ACCOMODATION OPTIONS UNJUSTIFIABLY REJECTED BY DEFENDANT

28. The Defendant could have accommodated Plaintiff's sincere religious beliefs without undue hardship (indeed, with no cost whatsoever, if Plaintiff paid for testing). Defendant failed to engage in the interactive process to legitimately consider all possible accommodations. This caused Defendant to overlook accommodations posing less than a substantial, or even a *de minimis* burden including: (1) testing for COVID antibodies and acknowledging that Plaintiff's natural immunity satisfied Defendant's immunization requirements (because it is superior to vaccine-induced immunity); (2) weekly testing for

COVID-19 (for which Plaintiff was willing to pay for and which is a more reliable indication of safety than vaccination); (3) testing/masking when required to attend an in-person meeting; or (4) any combination of the above.

29. At the time of Plaintiff's termination, the CDC had conclusively stated that individuals vaccinated for COVID-19 could nevertheless contract and spread COVID-19. On March 29, 2021, the Director of the CDC Rochelle Walensky publicly stated that the CDC's own data "suggests, you know, that vaccinated people do not carry the virus, don't get sick, and that it's not just in the clinical trials but it's also in real world data."[1]

30. However, because the real-world data already demonstrated breakthrough infections in the vaccinated just three months after the Pfizer-BioNTech vaccine received FDA approval, the CDC immediately thereafter clarified Director Walensky's statements and confirmed that vaccinated individuals do in fact become infected and spread the virus to others. *See* CDC Reverses Statement by Director, (April 2, 2021), available at: https://thehill.com/changingamerica/well-being/546234-cdc-reverses-statement-by-director-that-vaccinated-people-are-no/.

---

[1] Statement from CDC Director Rochelle P. Walensky, MD, MPH on Rachel Maddow Show (March 29, 2021), transcript available at: https://www.msnbc.com/transcripts/transcript-rachel-maddow-show-3-29-21-n1262442?utm_content=buffer7fb12&utm_medium=Arianna&utm_source=LinkedIn&utm_campaign=Buffer.

31. Before instituting its vaccination policy, Defendant knew or should have known that the vaccines were largely ineffective at controlling the spread of COVID-19. As early as July 2021, Director Walensky admitted that the vaccinated had similarly high viral loads of SARS-CoV-2 as the unvaccinated and thus could still contract and spread the Delta variant.[2]

32. In August 2021, a joint study by CDC and the Wisconsin Department of Health services further confirmed Director Walensky's admission. The study indicated that vaccinated individuals had a 5% higher viral load than the unvaccinated and were not only just as likely to transmit the virus as the unvaccinated but posed a greater contagion risk due to the increased likelihood of asymptomatic infection.[3]

33. Highlighting the irrationality of Defendant' continued pursuit of enforcing its mandate against religious employees, Defendant refused to recognize natural immunity as satisfying its immunization requirement. This is despite the fact

---

[2] *Statement from CDC Director Rochelle P. Walensky, MD, MPH on Today's MMWR*, CDC News Room (July 30, 2021), available at https://www.cdc.gov/media/releases/2021/s0730-mmwr-covid-19.html [https://perma.cc/VR5V-E67A] ("Today, some of those data were published in CDC's Morbidity and Mortality Weekly Report (MMWR), demonstrating that Delta infection resulted in similarly high SARSCoV-2 viral loads in vaccinated and unvaccinated people. High viral loads suggest an increased risk of transmission and raised concern that, unlike with other variants, vaccinated people infected with Delta can transmit the virus.").

[3] *See* Kasen Riemersma, et. al, *Shedding of Infectious SARS-CoV-2 Despite Vaccination*, *medRxiv* (August 24, 2021), available at:
https://www.medrxiv.org/content/10.1101/2021.07.31.21261387v4.full.pdf.

that the international scientific community had conclusively established through centuries of research that natural immunity is superior to vaccine-elicited immunity. *See Plotkin's Vaccines*, 7th Edition, at Section 2.

34. Defendant is a sophisticated health care services provider and should have been aware of the fallacy of enforcing its vaccination Policy in the context of undue hardship and failed to even consider the religious beliefs of Plaintiff when determining whether it could exempt her.

35. Alternatively, periodic COVID-19 testing—or even testing when travel to offices was required—would also have been costless accommodation. As the CDC recognized in August of 2021, COVID-19 vaccines work "with regard to severe illness and death—they prevent it. But what they can't do anymore is prevent transmission."[4]

36. Because vaccinated individuals may also contract and transmit COVID-19, a negative COVID-19 test is a more reliable indication of safety from the virus than a vaccination at some earlier time. This fact was also well-known at the time Defendant failed to accommodate Plaintiff and should have been considered as a reasonable accommodation to the vaccine mandate.

---

[4] Statement by Rochelle Walensky, U.S. Centers for Disease Control, CNN Interview (Aug. 5, 2021), available at https://www.cnn.com/2021/08/05/health/us-coronavirus-thursday/index.html.

37. Having Plaintiff wear a mask on the rare occasion she would have needed to meet someone in person was another possible reasonable accommodation. As even healthcare companies in the country have shown—including vaccine manufacturer Janssen (J&J)—religiously exempt employees may be accommodated without increased risk or cost through masking.

38. However, even though Ms. Kemmler worked at Saint Mary's corporate office, miles away from the main retirement community campus, none of these accommodations were even considered by Saint Mary's.

## APPLICABLE LAW

39. Title VII prohibits Defendant from discriminating against employees based on their religion. 42 U.S.C. § 2000e-2(a)(1). This "include[s] all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

40. In other words, an employer must "make reasonable accommodation for the religious observances of its employees, short of incurring an undue hardship."

*EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 312 (4th Cir. 2008)

(quoting *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75 (1977)).[5]

41. This allows a plaintiff to raise claims of religious discrimination under both

a disparate treatment theory and a failure-to-accommodate theory. *Chalmers*

*v. Tulon Co. of Richmond*, 101 F.3d 1012, 1018 (4th Cir. 1996).

42. Failure to engage in the interactive process to find a solution for an exempt

employee "is not an independent violation of Title VII. But as a practical

matter, such failure can have adverse legal consequences [because] where an

employer has made no effort to act on an accommodation request, courts have

found that the employer lacked the evidence needed to meet its burden of

proof to establish that the plaintiff's proposed accommodation would actually

have posed an undue hardship." EEOC Guidance, *Section 12: Religious*

*Discrimination*, Part 12-IV.A.2 (citing *EEOC v. Ithaca Indus., Inc.*, 849 F.2d

116, 118-19 (4th Cir. 1988) (finding that employer's failure to attempt to

accommodate, absent any showing of undue hardship, violated Title VII)); *see*

*also EEOC v. Arlington Transit Mix, Inc.*, 957 F.2d 219, 222 (6th Cir. 1991)

("After failing to pursue . . . any other reasonable accommodation, the

---

[5] *Hardison* has been superseded in some respects. In *Groff v. DeJoy* 22-174, (2023), the U.S Supreme Court has clarified employers' obligations to accommodate employees' religious practices. The Court reinterpreted the meaning of "undue hardship" and held that Title VII requires an employer who denies a religious accommodation must show that the burden of granting an accommodation would result in "**substantial increased costs** in relation to the conduct of its particular business." (Emphasis added).

company is in no position to argue that it was unable to accommodate reasonably [plaintiff's] religious needs without undue hardship on the conduct of its business.").

43. Title VII also prohibits Defendant from retaliating against an employee for engaging in protected activity. *Fogleman v. Mercy Hosp., Inc*., 283 F.3d 561, 571 (3d Cir. 2002) see also, *Moore v. City of Philadelphia*, 461 F.3d 331, 341-42 (3d Cir. 2006) *Ferra v. Potter*, 324 F. App'x 189, 192 (3d Cir. 2009) ("As this Court has explained, '[w]ith respect to `protected activity,' the anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings . . . and those who oppose discrimination made un-lawful by Title VII. . . .'").

## FIRST CLAIM FOR RELIEF
## TITLE VII – RELIGIOUS DISCRIMINATION –
## FAILURE TO ACCOMMODATE
(42 U.S.C. § 2000e-2(a)(1))

44. Plaintiff incorporates herein by reference all preceding paragraphs.

45. An employee may assert a claim, for his employer's failure to accommodate, or continue accommodating an existing accommodation, of his sincere religious beliefs, so long as the accommodation does not impose undue hardship on the employer. *See Storey v. Burns Intern. Sec. Servs.,* 390 F.3d 760, 764 (3d Cir. 2004) ("An employer's failure to reasonably accommodate the employee's sincerely held religious beliefs that conflict with a job

requirement can also amount to an adverse employment action unless the employer can demonstrate…'undue hardship.'").

46. To establish a prima facie claim for failure to accommodate a plaintiff must present evidence that: "(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; and (3) he or she was disciplined for failure to comply with the conflicting employment requirement." *Wilkerson v. New Media,* 522 F.3d 315, 319 (3d Cir. 2008) ("To establish a prima facie case of a failure to accommodate claim, the employee must show: (1) she has a sincere religious belief that conflicts with a job requirement; (2) she told the employer about the conflict; and (3) she was disciplined for failing to comply with the conflicting requirement.") (*Quoting Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75 (1977) as superseded by *Groff*).

47. Once the plaintiff has made out a prima facie case for discrimination, "the burden then shifts to the employer to show that it could not [reasonably] accommodate the plaintiff's religious needs without undue hardship." *Groff v. Dejoy,* 35 F.4th 162, 169 (3d Cir. 2022).

48. Plaintiff clearly established her "bona fide religious belief" and its conflict with the Policy when she submitted her religious accommodation request to Defendant. Because Plaintiff could not receive the COVID-19 vaccine

without violating her religious beliefs, she could not comply with the Policy and was thus subject to adverse action by termination. While Defendant may now attempt to challenge Plaintiff's beliefs, it is not the employer's place to question or interpret an employee's religious beliefs, *Equal Employment Opportunity Commission v. Geo Group, Inc.,* 616 F.3d 265, 291 (3d Cir. 2010) ("An employer is not entitled to interpret the employee's religion and determine what is and is not religiously acceptable to them.").

49. Defendant chose to chill the Plaintiff's faith-based requests by telling her she would be terminated based on a deadline if she was not in compliance. Thereafter, it terminated Plaintiff without engaging further in any interactive process to attempt to find workable continuing accommodation that would not pose an undue hardship to the company. Even if not a standalone claim, the failure to engage in a meaningful interactive process signals an employer's violation of its duty to accommodate because the employer is attempting to remain purposefully ignorant of potential reasonable accommodations.

50. To establish the defense of "undue hardship," Defendant must demonstrate that any aforesaid accommodations would "bear more than a substantial cost" on the company. *Groff* at 22-174. The above stated accommodation required no additional cost or logistical burden to Defendant.

51. The ability to provide reasonable accommodations to employees such as Plaintiff is also evident by considering other companies similarly situated to Defendant—including countless hospitals and even COVID-19 vaccine manufacturers such as Janssen (J&J)—that were able to accommodate employees with religious based objections to mandatory COVID-19 vaccination policies. Defendant is thus without excuse as to why it failed also to follow federal employment law in this regard.

52. Title VII requires an employer to thoroughly consider all possible reasonable accommodations and not just reject requests out of hand with form denials. "If the accommodation solution is not immediately apparent, the employer should discuss the request with the employee to determine what accommodations might be effective."[6]

53. To be sure, testing was a reasonable accommodation even for people physically entering the workplace—it is undisputed that someone cannot catch COVID-19 from someone who does not have COVID-19. And to the extent that Plaintiff would even need to be in contact with other employees, a negative COVID-19 test would have confirmed that she was less of a contagion hazard than untested individuals who were vaccinated at some earlier point in time but who could still contract and transmit COVID-19.

---

[6] EEOC Guidance Section 12: Religious Discrimination; Part IV, A.2.

54. In denying Plaintiff's request, Defendant blankly asserted "significant undue hardship" and provided no justification as to why or how accommodations were unable to be done without undue hardship. This is especially true where recognition of Plaintiff's natural immunity and/or continued isolation (for example) required no cost, effort, or operational change to the status quo.

55. Moreover, the Defendant was on actual of notice both the many possible accommodation options for Plaintiff (as it had provided some) and the fact that the failure to continue using one or more of them would result in a Title VII violation. Nonetheless, Defendant forged forward with its campaign to eliminate its religious employees, including Plaintiff, as well as likely anyone else who did not blindly obey Defendant's command that all employee's had to be vaccinated or end up terminated.

56. Therefore, Defendant unlawfully discriminated against Plaintiff based on her sincerely religious beliefs by failing to continue accommodating those beliefs. Defendant cannot demonstrate that doing so would have imposed any hardship whatsoever, let alone undue hardship.

**SECOND CLAIM FOR RELIEF**
**TITLE VII – RETALIATION – OPPOSITION CLAUSE**
(42 U.S.C. §2000e-3(a))

57. Plaintiff incorporates herein by reference all preceding paragraphs.

58. Title VII also makes it unlawful for "an employer to discriminate against any of [its] employees . . . because he has opposed any practice made unlawful by this subchapter." 42 U.S.C. § 2000e-3(a).

59. A *prima facie* case for retaliation requires a showing "that (1) he engaged in activity protected by Title VII; (2) that an adverse employment action was taken by the employer; and (3) that a causal link existed between the protected activity and the adverse action." *Ortiz,* Civil No. 1:18-CV-456, at *11.

60. Here, Plaintiff engaged in protected activity under Title VII when she sought a religious accommodation from the Policy that would otherwise require her to violate her sincere religious beliefs. Plaintiff continued to oppose Defendant's unlawful practice through her formal termination.

61. Then, because of her request for accommodation, Defendant subjected Plaintiff to its process to coerce her from exercising her rights under federal law. Defendant's Policy was not designed to look for reasonable accommodation for Plaintiff because Defendant never intended to fully accommodate Plaintiff. Were it not for Plaintiff's beliefs and her request for accommodation, she would not have been subjected to such treatment.

62. After denying Plaintiff's request, and Plaintiff's opposition thereto, Defendant pressured her to capitulate and get the COVID-19 vaccine under threat of termination.

63. Defendant imposed deadlines with the intent to punish those who sought religious accommodation; hoping that the constant reminder of termination would result in them abandoning their religious beliefs and surrendering to a coerced injection of a COVID-19 vaccine.

64. Defendant's Policy forced those who were denied religious accommodations or placed in temporary accommodations with the caveat of impending termination, into a period of extreme emotional and psychological distress, seeking to coerce religious employees into compliance.

65. But for her request for religious accommodation, Plaintiff would not have experienced the psychological and emotional distress from the period of temporary accommodation where she was constantly pressured to violate her religious beliefs.

66. Defendant also terminated Plaintiff for seeking a religious accommodation to its compulsory vaccination Policy. Plaintiff maintained her request for accommodation through the date of her termination. Defendant terminated Plaintiff in close temporal proximity to her requesting religious accommodation and/or seeking continued accommodations.

67. Separately, Defendant refused to admit its mistake and bring Plaintiff back even after it became apparent that (1) accommodations were available; (2) the COVID-19 vaccines were not preventing contraction of the virus; and (3)

individuals with natural immunity possessed superior immunity to those with the vaccine only. Such actions were due to Plaintiff's opposition to Defendant' illegal employment practice. The company had made up its mind to purge as many unvaccinated religious employees as it believed it could and the position against those seeking accommodations had become entrenched.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court:

(a)     Declare Defendant violated Title VII by failing to engage in the interactive process in response to Plaintiff's request for accommodations to its Policy and, instead, preemptively denying his request based on pretextual reasons.

(b)     Declare Defendant violated Title VII for its failure to provide reasonable accommodation and disparately treated Plaintiff to her clearly articulated religious beliefs when numerous no-cost options were available.

(c)     Declare that Defendant violated Title VII by retaliating against Plaintiff for engaging in protected activity through seeking religious accommodation and opposing unlawful measures taken by the Defendant to prevent her from seeking accommodation.

(d)     Award Plaintiff damages, including back pay, front pay, pre-judgment and post-judgment interest, punitive damages (if and where applicable) compensatory damages and other affirmative relief necessary to eradicate the effects of Defendant' unlawful employment practices.

(e)     Award Plaintiff damages necessary to make her whole by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described above, including emotional pain, suffering, inconvenience, loss of enjoyment of life, humiliation, and loss of civil rights, in an amount determined at trial.

(f)     Award reasonable attorney fees and costs; and

(g)     Award such other and further relief that this Court may deem just and equitable.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby respectfully demands trial by jury on all counts so triable.

DATED this the 14 day of August 2023.

*By: /s/ Jeremy A. Donham, Esquire*
Jeremy Donham, (206980)
**DONHAM LAW**
714 Venture Drive, Ste. 144
Morgantown, West Virginia 26508
(717) 881-7855 (phone)
Email: J.Donham@Donhamlaw.com

Jesse C. Markley (315758)
**MARKLEY LAW FIRM LLC**
1350 Woodridge Dr.
Middletown, PA 17057
(717) 376-8403 (cell)
Email: Markleylawfirm@gmail.com

Charles J. Hobbs (209321)
*Pro hac Vice Pending*
**THE HOBBS LAW FIRM**
256 E. Market Street
York, PA 17403
(717) 793-2398 (Phone)
Email: chobbs@thehobbslawfirm.com